**NOT FOR PUBLICATION**

### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

| | |
|---|---|
| AUTOBAR SYSTEMS OF N.J., d/b/a TOTAL LIQUOR CONTROLS, <br><br> Plaintiff, <br><br> v. <br><br> BERG LIQUOR SYSTEMS, LLC, *et al.*, <br><br> Defendants. | Civil Action No. 23-3790 (MAS) (JBD) <br><br> **MEMORANDUM OPINION** |

**SHIPP, District Judge**

This matter comes before the Court upon receipt of the Mandate of the United States Court of Appeals for the Third Circuit dated September 10, 2024 regarding Plaintiff Autobar Systems of N.J., d/b/a Total Liquor Controls's ("Total Liquor" or "Plaintiff") motion for a preliminary injunction. (ECF No. 43.) Plaintiff submitted a brief in further support of its motion for a preliminary injunction (ECF No. 44), and Defendant Berg Liquor Systems, LLC ("Berg" or "Defendant") submitted a brief in opposition (ECF No. 45). Plaintiff and Defendant also submitted respective pre-hearing memoranda. (ECF Nos. 60, 63.) On April 14, 2025, the Court held an evidentiary hearing, at which it received documentary exhibits and heard live testimony from two witnesses: Albert Dorsey ("Dorsey") and Steven Barton ("Barton"). (ECF No. 75.) At the Court's direction, the parties also submitted post-hearing briefing (ECF Nos. 73, 74) and replies (ECF Nos. 79, 80). After careful consideration of the evidence presented and the parties' arguments, Plaintiff's motion is denied.

## I.     **FINDINGS OF FACT**

The following facts are supported by the record.

### A.     **Pre-Dealership Agreement**

1.      Total Liquor is a New Jersey corporation that was founded in 1963 by Dorsey's father. (Tr. 19:7-10, ECF No. 78; Compl. ¶ 3, ECF No. 1-1.)

2.      When Total Liquor was founded, it sold, installed, and serviced the liquor control system called Autobar. (Tr. 18:21-24.)

3.      Dorsey joined Total Liquor in approximately 1977, and his brother, John Dorsey,[1] joined the company the following year. (*Id.* at 18:18-19, 19:24-20:2.)

4.      Total Liquor set up its business at 164 Monmouth Street, Red Bank, New Jersey in approximately 1973. (*Id.* at 19:17-18.)

5.      Berg Company, LLC is a Wisconsin limited liability company in the business of manufacturing and selling liquor control systems and technology to bars and restaurants. (ECF No. 9-14 at 1.)[2]

6.      Dorsey was a part-owner of Berg Company, LLC beginning in 2002, and his share began "at about 10 percent and grew to about 14 percent." (Tr. 23:10-11, 30:18-24.)

---

[1] John Dorsey has since passed away. (Tr. 19:19-21.)

[2] Plaintiff's counsel represented to the Court that Exhibit P-10, which was entered into evidence during the evidentiary hearing, was the Asset Purchase Agreement ("APA"), albeit missing the first four pages. (Tr. 24:9-13.) As such, the Court looks to the first four pages of the APA in Exhibit A to the Declaration of Steve Barton dated August 7, 2023, for the purposes of this motion. (*See* ECF No. 9-14.)

### B.    Dealership Agreement

7.      On February 26, 2003, Berg Company, LLC and Total Liquor entered into a Dealership Agreement (the "Dealership Agreement") by which Total Liquor became a "non-exclusive dealer" of certain Berg Products ("Berg Products").[3] (Ex. P-1 at 2, 7, ECF No. 61.)

8.      Section One of the Dealership Agreement states that "[d]uring the term of this [Dealership] Agreement, Dealer shall not engage in the manufacture, sale or service, directly or indirectly, of any product that in Berg's reasonable opinion is competitive to [Berg] Products." (*Id.* ¶ 1.)

9.      Section Two of the Dealership Agreement states that "[t]he parties shall be deemed to be solely independent contractors and this [Dealership] Agreement shall not be construed to create any partnership, franchise, joint venture or agency." (*Id.* ¶ 2.)

10.     Under the Dealership Agreement, Total Liquor had to "maintain an active sales/service organization" in its trading territory. (*Id.* ¶ 3.)

11.     Total Liquor's territory included the counties of Nassau, Suffolk, Westchester, and the five Boroughs of Manhattan in the state of New York, and the counties of Passaic, Morris, Bergen, Essex, Hudson, Union, Somerset, Middlesex, Monmouth, Ocean, Atlantic, and Cape May in the state of New Jersey. (*Id.* at 8.)

12.     During the term of the Dealership Agreement, "Berg grant[ed] [Total Liquor] a limited nonexclusive license to display the trademarks, logo and trade names belonging to Berg in a positive and non-disparaging manner solely in connection with its advertising and sale of [Berg] Products, and to designate itself as an 'Authorized Berg Dealer.'" (*Id.* ¶ 13.)

---

[3] The Berg Products listed in the Dealership Agreement are: (1) Infinity ID; (2) Infinity 1544; (3) Infinity All Bottle; (4) Laser; (5) Laserita; (6) 1544; (7) 744; (8) 702; (9) Tap One; and (10) Draft Sentinel. (Ex. P-1 at 7.) As Berg came out with new products and discontinued others, however, the products that Total Liquor sells have changed over time. (*See* Tr. 107:25-109:4.)

13.     Section Fifteen of the Dealership Agreement states that "[t]his [Dealership] Agreement . . . will continue in effect until either party terminates, with or without cause, upon thirty (30) days prior written notice." (*Id.* ¶ 15.)

14.     Exhibit C of the Dealership Agreement sets forth that Total Liquor's yearly quota in U.S. dollars is $200,000. (*Id.* at Ex. C.)

        **C.      The Asset Purchase Agreement**

15.     Berg is a Wisconsin Limited Liability Company owned by Barton. (ECF No. 9-14 at 1; Tr. 22:2-4.)

16.     In May of 2022, Berg Company, LLC and Berg Liquor Systems, LLC ("Berg") entered into the Asset Purchase Agreement ("APA"), under which Berg bought substantially all of the assets of Berg Company, LLC. (ECF No. 9-14 at 1; Tr. 23:14-23.)

17.     The APA included an assignment of the Dealership Agreement to Berg. (ECF No. 9-14 at 1-2.)

18.     The APA also contains a non-compete agreement, which states in relevant part that:

> For a period of five (5) years commencing on the Closing Date (the "Restricted Period"), the Seller Parties,[4] shall not, and shall not permit any of their respective affiliates to, directly or indirectly, (i) engage in or assist others in engaging in a business that competes, directly or indirectly, with the Business ("Restricted Business") in any jurisdictions or territories in which the Seller operates (the "Territory").

("APA", Ex. P-10 ¶ 6.6.)

---

[4] The "Seller Parties" are defined as Berg Company, LLC and "the holders of membership interests of Seller listed as a Member on the signature pages hereto," which includes Albert and John Dorsey. (ECF No. 9-14 at 1, 20.)

**D.    Berg Sends Termination Letters to Total Liquor**

19.    On February 22, 2023, Berg sent a letter to Total Liquor stating: "Pursuant to section [Fifteen] of the Berg Dealership Agreement between Berg Company, LLC and Total Liquor . . . please allow this letter to serve as notice of termination of the Dealership Agreement." (Ex. P-2.)

20.    Total Liquor responded on March 7, 2023, and "advised that Total Liquor expressly reject[ed] [Berg's] purported termination of the [Dealership] Agreement," arguing that the termination was ineffective because Berg did not have the right to unilaterally terminate the Dealership Agreement under the New Jersey Franchises Practices Act ("NJFPA"). (Ex. P-3 at 1.)

21.    On April 20, 2023, Berg sent another letter to Total Liquor, stating the following:

> Please allow this letter to serve as termination of your Dealership Agreement pursuant to section [Fifteen] of the Dealership Agreement and pursuant to N.J. Rev. Stat. § 56:10-5. This termination is made with good cause because you have failed to substantially comply with the requirements imposed upon you by Berg. Specifically, [Total Liquor] has failed to meet its quota requirements for sales for more than five (5) years. In fact, for the last ten years, your annual sales have only averaged $86,517.69. Despite requests for you to increase your sales volumes to meet quotas, you have failed to do so.
>
> Moreover, despite your declining sales, [Total Liquor] has engaged in behavior that is directly competitive with Berg. You have admitted to working with our competitors to bid on projects that you knew Berg was seeking. This behavior is fundamentally contrary to your claimed exclusive arrangement with Berg, and violates the [APA] your owners signed with Berg. You have been instructed to cease any competitive behavior with Berg, but you have failed to comply with any such requests.
>
> This termination shall become effective within sixty (60) days.

(Ex. P-4 at 1-2.)

22.     Approximately one month later, on May 23, 2023, Total Liquor responded with a letter stating that the termination in the April 20th letter was still a violation of the NJFPA and demanded that the termination notice be rescinded immediately. (Ex. P-7 at 1.)

23.     Total Liquor sent another letter on June 7, 2023, demanding that Berg immediately rescind its termination of the Dealership Agreement and threatened to proceed with filing an Order to Show Cause to enforce its rights under the NJFPA if it did not receive a response before close of business on Friday, June 9, 2023. (Ex. P-8 at 1.)

24.     Berg did not respond. (*See* Ex. P-9 at 1.)

25.     Total Liquor sent Berg another letter on June 19, 2023, yet again demanding that Berg rescind its termination, and if it did not, Total Liquor would "proceed with the immediate filing of an Order to Show Cause to enforce its rights under the [NJ]FPA." (*Id.* at 1.)

26.     Berg did not respond, and pursuant to Berg's April 20th termination letter, the Dealership Agreement terminated. (*See* Tr. 44:6-18; Ex. P-4 at 1-2.)

        **E.     The Instant Action**

27.     On June 30, 2023, Total Liquor commenced this lawsuit by filing the Complaint in the Superior Court of New Jersey, Monmouth County, Chancery Division ("State Court"). (*See* Notice of Removal, ECF No. 1; Compl., ECF No. 1-1.)

28.     The Complaint alleges four causes of action: (1) violation of the NJFPA; (2) breach of contract; (3) breach of the duty of good faith and fair dealing; and (4) declaratory judgment. (*See* Compl. ¶¶ 71-103.)

29.     Along with the Complaint, Total Liquor filed an Order to Show Cause Seeking Temporary Restraints and Preliminary Injunctive Relief (the "OTSC"), which the State Court entered the same day. (Notice of Removal 2.)

30.    Berg removed this action to this Court on July 14, 2023, under 28 U.S.C. § 1332, invoking

diversity jurisdiction. (*Id.* at 3.)

31.    Since the State Court had not yet resolved the OTSC, this Court set a briefing schedule and

deferred the decision of whether to hold a hearing until after reviewing the briefing. (ECF No. 5.)

32.    The parties submitted their respective briefs (ECF Nos. 9, 10), and on August 16, 2023,

this Court decided the OTSC for a preliminary injunction without a hearing ("DNJ Order") (DNJ

Order, ECF No. 12).

33.    This Court denied Total Liquor's OTSC for a preliminary injunction because Total Liquor

did not meet its burden of establishing irreparable harm. (*Id.* at 2.)

34.    Specifically, this Court found that Total Liquor "ha[d] not demonstrated that it will be

forced to shut down its business." (*Id.* at 4.)

35.    Total Liquor "still ha[d] 15% of its revenue coming from products outside of [Berg]," and

"while Total Liquor contends that it is precluded from selling any products that [Berg] directly

competes with, Total Liquor can still market to other customers." (*Id.*)

36.    This Court further found that monetary damages were "reasonably ascertainable." (*Id.*)

37.    On August 23, 2023, Total Liquor filed a notice of appeal as to the DNJ Order. (ECF

No. 14.)

38.    On September 10, 2024, this Court received the Mandate of the United States Court of

Appeals for the Third Circuit. (ECF No. 43.)

39.    The Third Circuit held that this Court overlooked the noncompete agreement when

analyzing irreparable harm and therefore vacated and remanded to allow this Court to "reconsider

irreparable harm." (3d Cir. Op. 4-5, ECF No. 43-1.)

40.    The Third Circuit directed that "[o]n remand, the [C]ourt should clarify which portions of the declarations and other evidence it finds credible and whether Total [Liquor] offers enough concrete evidence that, absent a preliminary injunction, it will have to go bankrupt or shut down." (*Id.* at 5.)

41.    After the ruling from the Third Circuit, this Court scheduled a preliminary injunction evidentiary hearing. (ECF No. 55.)

42.    The parties submitted pre-hearing briefing. (ECF Nos. 60, 63.)

43.    An evidentiary hearing was held on April 14, 2025, at which the following individuals testified: Albert Dorsey and Steven Barton. (*See generally* Tr.)

44.    The parties then submitted post-hearing briefing on April 25, 2025 (Pl.'s Post-Hearing Br., ECF No. 73; Def.'s Post-Hearing Br., ECF No. 74) and replies on May 2, 2025 (Pl.'s Post-Hearing Reply Br.; ECF No. 80; Def.'s Post-Hearing Reply Br., ECF No. 79).

## II.    **LEGAL STANDARD**

In demonstrating a preliminary injunction is warranted, a plaintiff must establish the following elements: "(1) the plaintiff is likely to succeed on the merits; (2) denying the injunction will result in irreparable harm to the plaintiff; (3) granting the injunction will not result in greater harm to the defendant; and (4) the injunction is in the public interest." *Watchung Spring Water Co. v. Nestle Waters N. Am. Inc.*, No. 14-4984, 2014 WL 5392065, at *2 (D.N.J. Oct. 23, 2014) (citing *Novartis Consumer Health, Inc. v. Johnson & Johnson–Merck Consumer Pharms. Co.*, 290 F.3d 578, 596 (3d Cir. 2002)). It is settled law that a preliminary injunction is "an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation omitted).

8

Preliminary injunctions are not appropriate remedies to prevent the possibility of some remote future injury. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).

The first two factors, commonly referred to as the "gateway factors," are the "most critical." *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017). Only once these gateway factors are met should a court consider the remaining two factors. *Id.* "A plaintiff's failure to establish any element . . . renders a preliminary injunction inappropriate." *NutraSweet Co. v. Vit-Mar Enters., Inc.*, 176 F.3d 151, 153 (3d Cir. 1999) (citing *Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 192 (3d Cir. 1990)).

## III.  DISCUSSION

### A.  Irreparable Harm

In the DNJ Order, this Court found that Plaintiff had not carried its high burden of establishing irreparable harm. (DNJ Order 4-5.) On remand, the Third Circuit directed this Court to "clarify which portions of the declarations and other evidence it finds credible and whether Total [Liquor] offers enough concrete evidence that, absent a preliminary injunction, it will have to go bankrupt or shut down." (3d Cir. Op. 5.) Total Liquor argues that it "has suffered irreparable harm" because it is "[u]nable to operate as a Berg dealer, and unable to compete with Berg in the liquor control systems industry," and therefore "Total Liquor has no ability to continue as a viable business." (Pl.'s Post-Hearing Br. 25, 35.)

#### 1.  *Immediate Harm*

To be granted a preliminary injunction, Total Liquor must show "that the feared injury is irreparable; mere injury, even if serious or substantial, is not sufficient." *United States v. Pennsylvania*, 533 F.2d 107, 110 (3d Cir. 1976). But "[e]stablishing a risk of irreparable harm is not enough." *ECRI v. McGraw-Hill, Inc.*, 809 F.2d 223, 226 (3d Cir. 1987). Total Liquor must

9

make a "clear showing of *immediate* irreparable injury." *Louis v. Bledsoe*, 438 F. App'x 129, 131 (3d Cir. 2011) (emphasis added) (citing *Cont'l Grp., Inc. v. Amoco Chems. Corp.*, 614 F.2d 351, 359 (3d Cir. 1980)).

The instant case was filed nearly *two years ago*, on June 30, 2023. (*See* Compl.) While Total Liquor may have moved swiftly enough in its initial filing of the Complaint (*see* Ex. P-4 (giving Total Liquor 60-days' notice of Berg's termination of the Dealership Agreement on April 20, 2023); Compl. (filed on June 30, 2023, approximately ten days after termination)), it did not pursue an expedited appeal of the DNJ Order. *See generally Autobar Sys. of N.J. v. Berg Co., et al.*, No. 23-2541 (3d Cir. 2023) (showing that the appeal was docketed on August 25, 2023). There are also no filings in the Third Circuit docket which reflect that Total Liquor sought an expedited ruling from the Third Circuit to avoid its impending closure. As a result, Plaintiff received a decision from the Third Circuit over a year after this Court issued the DNJ Order. (*See* DNJ Order (issued August 16, 2023); 3d Cir. Op. (Mandate issued September 10, 2024).)

"[D]elay . . . knocks the bottom out of any claim of immediate and irreparable harm." *Pharmacia Corp. v. Alcon Lab'ys, Inc.*, 201 F. Supp. 2d 335, 383 (D.N.J. 2002). Here, there has been a lengthy delay because of Plaintiff's choice not to pursue an expedited appeal. "Where a movant is found to be able to wait for the outcome of an appeal before obtaining preliminary injunctive relief, the irreparable harm [it] faces may not ordinarily be deemed 'imminent' as required to sustain a preliminary injunction." *Rodriguez ex rel. Rodriguez v. DeBuono*, 175 F.3d 227, 235 (2d Cir. 1999); *see Doe v. Banos*, 713 F. Supp. 2d 404, 415 n.15 (D.N.J. 2010) ("Delay alone may justify denial of a preliminary injunction.") (citation omitted), *aff'd*, 416 F. App'x 185 (3d Cir. 2010). Total Liquor's failure to seek an expedited appeal, coupled with the fact that its

business still survives today, nearly two years later,[5] weighs strongly against a finding of immediate, irreparable harm. *See Def. Distributed v. Att'y Gen. of N.J.*, 972 F.3d 193, 201 (3d Cir. 2020) ("Plaintiffs' litigation strategy thus represents 'a strong indication that the status quo can continue' and belies an assertion of irreparable harm.").

### 2.    *Irreparable Harm*

"In order to demonstrate irreparable harm [Total Liquor] must demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial. The preliminary injunction must be the only way of protecting [Total Liquor] from harm." *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir. 1989). As such, "[t]he availability of adequate monetary damages belies a claim of irreparable injury" because "a purely economic injury, compensable in money, cannot satisfy the irreparable injury requirement." *Frank's GMC Truck Ctr., Inc. v. Gen. Motors Corp.*, 847 F.2d 100, 102 (3d Cir. 1988). To determine whether a monetary remedy for a breach of contract claim would be adequate, the Third Circuit has provided that "the following circumstances are significant": (1) "the difficulty of proving damages with reasonable certainty"; (2) "the difficulty of procuring a suitable substitute performance by means of money awarded as damages"; and (3) "the likelihood that an award of damages could not be collected." *Instant Air Freight Co.*, 882 F.2d at 801-02 (citation omitted). The Court addresses each in turn.

---

[5] While Dorsey testified that the only reason Total Liquor has not declared bankruptcy in the past two years is because of his personal monetary contributions, Plaintiff did not present the Court with any documentary evidence or credible testimonial evidence demonstrating the amount of money that Dorsey has contributed. (Tr. 61:14-22 (A. . . . I've been funding it personally. I've been loaning money to the business quarterly. Q. Approximately what does the business owe back to yourself personally? A. To me, I honestly don't have an accurate figure. I think it's around [$]80,000.").) Without such evidence, the Court simply does not ascribe much weight to Dorsey's testimony on this topic.

### a.      Difficulty of Proving Damages with Reasonable Certainty

First, the Court addresses the difficulty of proving damages with reasonable certainty. *See id.* at 802. Money damages are readily ascertainable here, where the parties have been in business together for forty-five years. *See Golden Fortune Imp. & Exp. Corp. v. Mei-Xin Ltd.*, No. 22-1710, 2022 WL 3536494, at *7 (3d Cir. Aug. 5, 2022) (finding that money damages were readily ascertainable where the parties had a two-decade long history between them). Total Liquor has also provided financial statements and tax returns sufficient to determine an adequate monetary remedy. (*See* Exs. D-119, D-120, D-121; Compl., Ex. E.) While, as discussed further below, it is not exactly clear the percentage of Total Liquor's net revenue that Berg Products comprised as compared to other products, the Court is confident that after further litigation and discovery, an adequate monetary remedy could be calculated if necessary.

### b.      Difficulty of Procuring a Suitable Substitute Performance by Means of Money Awarded as Damages

Second, the Court addresses the difficulty of procuring a suitable substitute performance by means of money awarded as damages. *See Instant Air Freight Co.*, 882 F.2d at 802. Here, Total Liquor pleads an economic harm in the form of "the significant reduction in figures for gross receipts from 2022 to 2023" (Pl.'s Post-Hearing Br. 34) and provides tax returns to demonstrate this decrease since the termination of the Dealership Agreement (*See* Exs. D-119; D-120; D-121). Accordingly, "[s]uitable substitute performance by means of money awarded as damages can

compensate [Total Liquor] fully for its lost profits and other injuries it may prove."[6] *Instant Air Freight Co.*, 882 F.2d at 802.

### c.     Likelihood that an Award of Damages Could not be Collected

Third and finally, the Court addresses the likelihood that an award of damages could not be collected. *See id.* at 802. The key question here is "whether, despite the adequacy of money damages there, nonetheless, is irreparable injury since [Total Liquor] may no longer be in existence to collect any money damages it is awarded." *Id.* "[T]he loss of 'sales and service customers, and therefore profits'" "can rise to the level of irreparable harm only where they would 'force[ ] [the business] to shut down.'" *Golden Fortune Import*, 2022 WL 3536494, at *6 (first quoting *Frank's GMC Truck Ctr., Inc.*, 847 F.2d at 102, then *Instant Air Freight Co.*, 882 F.2d at 802). Total Liquor argues that it has "presented concrete evidence that its business has been destroyed as a direct result of Berg's unlawful termination." (Pl.'s Post-Hearing Reply Br. 4; Pl.'s Post-Hearing Br. 25.) As explained below, however, Total Liquor has not presented the Court with "concrete evidence" sufficient to sustain its high burden of proof to establish irreparable harm.

### i.     Percentage of Sales from Berg Versus Non-Berg Sources

As an initial matter, the Court finds it necessary to address Total Liquor's allegation that it "derives around 85% of its gross sales from its sale and installation of Berg Products upon which

---

[6] Plaintiff also argues that it has suffered irreparable harm because it had to fire its four employees since the termination of the Dealership Agreement. (*See* Pl.'s Post-Hearing Br. 37-38.) But while this is a "severe outcome," it does not meet the "significant" threshold that the Third Circuit requires for irreparable harm. *Experior Glob. Warehousing, LLC v. BTC III Hamilton DC LLC*, No. 23-8472, 2024 WL 3409828, at *13 (D.N.J. July 15, 2024) (quoting *Golden Fortune Import*, 2022 WL 3536494, at *6-7); *see also Instant Air Freight Co.*, 882 F.2d at 798 (finding no irreparable harm despite plaintiff's representation that it would "lose . . . many if not all of its employees").

its economic survival depends." (Compl. ¶ 29). At the evidentiary hearing, the evidence simply did not support this allegation.

Dorsey testified on direct examination that the allegation in the verified Complaint that 85% of Total Liquor's sales derive from Berg Products is "probably a little high," a "ballpark," and "[i]t's probably closer to 80." (*See* Tr. 41:24-42:7.) On cross-examination, when asked how he calculated the 85% revenue allocation to Berg Products, Dorsey testified that Total Liquor "never broke anything down that way[,] separating Berg and non-Berg sales, so we had to go and try to figure out what those differentiations would be." (*Id.* at 69:9-11.) When pressed further, Dorsey answered that "[w]e took the actual sales or the actual, yeah, sales from invoices for that time period, took the total sales and calculated what that percentage was and then subtracted cost of goods for Berg products, you know, purchases from Berg." (*Id.* at 69:20-70:23.) With this less than clear response from Dorsey, defense counsel proceeded to ask him about the dollar amounts of Berg-related revenue alleged in the verified Complaint versus the revenue reported in Total Liquor's tax returns, beginning with the year 2022:

> Q. - - can you walk us through how you get from $754,713 in gross receipts or sales of Berg products to 191,000 - - or total [$]754,713 in gross receipts or sales, that's line 1c, to the $191,716 that's in the complaint?
>
> A. I'd have to have a calculator. I mean, you've got 754 in sales, cost of goods is 300, or 293, so gross profits, 460. And then it's a percentage of that gross profit that is Berg and a percentage is non-Berg. We take the 460 and determine how much of our sales are Berg sales, and I think we took a five-year average to be perfectly fair instead of six months. We took five years and looked at gross sales, cost of goods, and total sales, and what percentages they were between the Berg and non-Berg. And the non-Berg is at a roughly 25 percent margin and the Berg is roughly a 75 percentage margin. It's just flipped. And that's only germane when you have a year that you're selling a lot of the non-Berg stuff.
>
> Q. In 2022, did you sell a lot of non-Berg stuff?

14

A. No. We never sell a lot of the non-Berg stuff. Sometimes we'll sell a little more than others, but it doesn't affect the bottom line that much because the margins are so much lower.

Q. I'm curious Mr. Dorsey. You say that, but then in your verified complaint, which you signed under oath, you said, "In 2022, our revenue from the sale of Berg products was $191,716." But on line 6 of the 2022 federal income tax return, which I presume you were also honest on, you said that the total income, which is the gross receipts less the cost of goods, was 462,000. Does that mean over half of your products in 2022 were non-Berg products?

A. No, impossible.

Q. Why?

A. Because we don't do that much non-Berg.

Q. So which one is inaccurate?

A. And the revenue.

[long pause]

THE COURT: Counsel, can you restate the last question?

MR. BURDETT: Yeah, sure. I believe we were looking at 191,716 in the verified complaint as the revenue for 2022 compared to line 6, which is 462,407, which is the total income, the gross receipts less the cost of goods sold. I was hoping Mr. Dorsey could explain to us why, you know, whether or not these were Berg products or other products.

THE WITNESS: They positively weren't other products. The vast majority of everything we've always done for 45 years is Berg, and the other stuff is just filler.

(Tr. 71:4-72:24.) Defense counsel continued questioning Dorsey about 2021 revenue:

Q. You indicate that your gross receipts were $494,585, correct?

A. Yes.

Q. And after the cost of goods sold, you still had total income of $326,158, correct?

A. Correct.

15

> Q. How does that number from 2021 square with the 51,712 that's in the verified complaint?
>
> A. (Pause.)
>
> THE COURT: Mr. Dorsey, if you don't know, you can just say you don't know, but we need to move this along.
>
> THE WITNESS: Yeah, I don't know.

(Tr. 73:23-74:9.) Dorsey similarly could not reconcile the Berg-related revenue alleged in the Complaint versus Total Liquor's tax returns in the years 2020 and 2019. (*See* Tr. 74:24-75:18 (2020: "Q. And so similar to the other amounts in the verified complaint versus the tax returns, can you explain to the Court where the - - how you derived the $139,464 in revenue versus the $302,877 in total income that you're showing on your tax return? A. No."); *Id.* at 75:19-76:18 (2019: "Q. Similar to the other tax returns, you can't square or explain to the Court the difference between the total income listed on your tax return and the amount set forth in the complaint? A. No, I cannot. I don't know why there's that discrepancy.").)

On redirect examination, Plaintiff's counsel attempted to allay this confusion, to no avail:

> [Q.] What was the mistake that was made in the verified complaint versus the tax return?
>
> A. I was referring to net income, not gross, because when we sell Berg, it's a high-profit item for us. If I sell anything else, I'm doing it to sell more Berg. And I give the stuff away. It's a loss leader almost.
>
> Q. So if we go to P-22 really quickly, same applies for all tax years, Section 6, total income. Does that mean net income?
>
> A. No. Well, total income is gross receipts less cost of goods. So, yeah, that would be total income, sure.

(*Id.* at 100:13-23.) The Court cannot discern from Dorsey's equivocating testimony whether or not he is representing that line 6 on the tax returns is net income or gross income. Dorsey suggests that the reason he could not reconcile the tax returns with the Complaint is because the Complaint

16

referred to *net* income, while line 6 on the tax returns—the line that defense counsel referred to on cross-examination—referred to *gross* income. (*See id.* at 100:15-18.) But when his counsel asked whether line 6 on the tax returns, labeled "Total income (loss)," means net income, Dorsey initially testifies "[n]o," suggesting that total income and net income are not the same. (*Id.* at 100:22-23.) Since the Complaint was supposedly based on net income, this would explain the discrepancy. But Dorsey continues: "So, yeah, that would be total income, sure." (*Id.*) Dorsey changed his answer to yes, suggesting that total income and net income are the same. This suggestion completely negates Dorsey's explanation of the discrepancy between the Complaint's purported use of net income and defense counsel focusing on gross income. Put simply, the Court was not presented with a reliable, credible explanation for the discrepancy between the Complaint and Total Liquor's tax returns in Dorsey's testimony.

In its post-hearing briefing, Total Liquor argues that "the 85% figure came from net revenue, not the gross revenue that Defendant focused on in Plaintiff's tax returns." (Pl.'s Post-Hearing Reply Br. 6.) But Plaintiff does not provide *any* documentary evidence to support this argument, such as the calculations that Plaintiff purportedly undertook to arrive at the dollar amounts of Berg-related sales per year in the Complaint, or Total Liquor's net income in any year from 2019 to 2022 that would demonstrate that the dollar amounts of Berg-related sales were in fact 80-85% of net income. (*See* Tr. 70:15-25.) The only concrete numbers that the Court has been provided is the data below, which sets forth the discrepancies brought out on Dorsey's cross-examination concerning Berg versus non-Berg sales and demonstrates that Berg sales were significantly lower than 85% of Total Liquor's sales:

| Year | Revenue From Sale of Berg Products in Complaint[7] | Net Revenue in Tax Returns | Berg Products Percentage of Gross Revenue |
|------|------|------|------|
| 2019 | $112,717.78 | $403,911[8] | 27% |
| 2020 | $139,464 | $302,877[9] | 46% |
| 2021 | $51,712 | $326,158[10] | 16% |
| 2022 | $191,716 | $462,407[11] | 41% |

(*See* Def.'s Post-Hearing Br. 6.)

Because Dorsey was unable to provide any coherent explanation as to the discrepancy between the 85% of Total Liquor's sales supposedly derived from Berg Products as alleged in the Complaint, and the chart above demonstrating that less than 50% of Total Liquor's sales were derived from Berg products based on Total Liquor's tax returns, the Court simply does not find Dorsey's testimony credible on this topic. The Court, therefore, does not have concrete evidence from Total Liquor demonstrating how much of its decline in revenue was actually due to its inability to sell Berg Products after termination of the Dealership Agreement.

### ii.    *Non-Compete Agreement*

The Court moves on to address the non-compete agreement between the parties, which states that Total Liquor "shall not, and shall not permit any of their respective affiliates to, directly or indirectly, [] engage in or assist others in engaging in a business that competes, directly or

---

[7] (Compl. ¶ 28.)

[8] Ex. D-119 (line 6, total income).

[9] Ex. D-120 (line 6, total income).

[10] Ex. D-121 (line 6, total income).

[11] Ex. P-21 (line 6, total income).

indirectly," with Berg's business. (APA ¶ 6.6.) In effect, this non-compete prevents Total Liquor from competing with Berg in the liquor control systems business. (*See* Tr. 106:17-23.) Total Liquor points to this non-compete agreement, coupled with the significant negative impact to its financial performance since the termination, to argue that its business has been destroyed and the only thing keeping it from filing bankruptcy is Dorsey's own financial contributions.[12] (*See* Pl.'s Post-Hearing Br. 25-38; Pl.'s Post-Hearing Reply Br. 4-8.)

As already explained in detail, the only reliable, concrete evidence concerning Total Liquor's percentage of Berg versus non-Berg sales suggests that Berg Products made up less than half of Total Liquor's net revenue. (*Compare* Compl. ¶ 28, *with* Exs. D-119 (line 6, total income); D-120 (line 6, total income); D-121 (line 6, total income); P-21 (line 6, total income).)

Total Liquor nonetheless argues that "the 2023 and 2024 financial statements introduced at the Hearing provided the benefit of '20/20' hindsight and chronicled the actual irreparable harm that Plaintiff has suffered."[13] (Pl.'s Post-Hearing Reply Br. 6.) Specifically, Plaintiff addresses its profit and loss statement for January 2024 through July 2024, noting that "its gross income was only $33,115, with a net income loss of ($92,264.04). (*Id.* at 6-7.) Thus, Plaintiff was not able to 'wait for the outcome' of the hearing as argued by Defendant. . . . Plaintiff's 62-year-old business *was* destroyed." (*Id.* at 6-7 (emphasis added).)

---

[12] As the Court previously noted, it was not provided with any documentary evidence concerning Dorsey's personal contributions to Total Liquor, and the Court does not give much weight to Dorsey's testimony in this regard. While the Court believes that Dorsey in fact has contributed money to Total Liquor, there is simply no concrete evidence as to the amount of such contributions, or the timing of such contributions. (*See* Tr. 61:14-22.)

[13] In the period of August 2023 to December 2023, Total Liquor's profit and loss statement shows a net loss of $69,413.05. (Ex. P-23 at 2.) It also shows that gross profit, which is total income less cost of goods sold, was $169,554.93. (*Id.*) In the period from January to July 2024, Total Liquor's profit and loss statement shows a net loss of $92,264, and a gross profit of $33,115.20. (Ex. P-24 at 1-2.)

Importantly, however, "[t]he relevant inquiry is whether the movant is in danger of suffering irreparable harm *at the time the preliminary injunction is to be issued.*" *IUE-CWA v. Flowserve Corp. of Pa.*, 239 F. Supp. 2d 527, 532 (M.D. Pa. 2003) (emphasis added) (citation omitted). "The irreparable harm inquiry concerns threat of future harm, not past harm." *TriFound Fin., LLC v. Greenberg*, No. 20-19303, 2021 WL 194763, at *5 (D.N.J. Jan. 20, 2021). To the extent that Plaintiff argues that it has already suffered irreparable harm, "a showing of past harm, without more, is insufficient to justify the issuance of a preliminary injunction." *Freedom Med. Inc. v. Whitman*, 343 F. Supp. 3d 509, 530 (E.D. Pa. 2018) (citation omitted).

If Plaintiff means to argue that the financial effect of losing Berg business from the termination of the Dealership Agreement is likely to cause bankruptcy or otherwise shut down Total Liquor's business and intends to submit these financial statements as evidence of the effect of losing such business, the evidence simply does not support this argument. As laid out exhaustively above, Total Liquor has not provided reliable evidence demonstrating that even half of its net revenue was derived from Berg Products before the termination. Plaintiff also did not offer concrete proof that loss of the Dealership Agreement and the non-compete were the sole reasons for Total Liquor's declining revenue. For example, Total Liquor failed to engage in any marketing or advertising in the four years leading up to the termination.[14] (Exs. P-21, P-22, D-120, D-121, at Line 16, Advertising). This lack of action provides the Court with an alternative explanation for Total Liquor's declining revenue.

---

[14] When asked whether Total Liquor spent money advertising Total Liquor or Berg products from 2019 to 2022, Dorsey testified: "We did. I don't know why it wasn't listed as advertising." (Tr. 76:23-77:6.) But the tax returns presented to the Court shows that Plaintiff did not spend any money on advertising during that time period. (Exs. P-21, P-22, D-120, D-121, at Line 16, Advertising.)

Moreover, Plaintiff's Dealership Agreement was non-exclusive, and Plaintiff was able to pursue areas of business outside of liquor control systems. *Cf. Pella Prods., Inc. v. Pella Corp.*, No. 18-1030, 2018 WL 2734820, at *13 (M.D. Pa. June 7, 2018) (finding irreparable harm where plaintiff was, inter alia, an "exclusive Pella distributor" and "sold only Pella windows and doors"). When asked whether Total Liquor took any steps to remain a viable business after termination of the Dealership Agreement, Dorsey responded that it did, but those "steps are thwarted by [Dorsey's] inability to sell Berg." (Tr. 53:25-54:5.) He went on to testify that Total Liquor "tried to sell other products [such as beer systems, beer coolers, and modular bars] but that's really not our business . . . [and w]e're giving it deeply discounted." (*Id.* at 54:11-55:3.) Dorsey also advised that he is trying to do service and repairs and become a sub-dealer for Berg.[15] (*Id.* at 55:4-23.)

Once again, however, the Court finds the credibility of Dorsey's testimony questionable. While Dorsey testified that "[Total Liquor] couldn't afford to sell the other products if [it is] not selling Berg because [it is] not making any money on it," (*id.* at 54:14-16), he testified on cross-examination that installing a draft beer system generated somewhere between $17,000 to $25,000 (*id.* at 95:10-23) and that Total Liquor sold draft beer systems that contributed to profit margins even before the termination of the Dealership Agreement (*id.* at 96:25-97:3 ("Q. But did some of those beer delivery systems contribute to your profit margin in the tax returns we looked at? A. Yes, yeah, absolutely.")). This evidence suggests that Total Liquor had other revenue sources but chose not to pursue them after termination of the Dealership Agreement.[16]

---

[15] Barton credibly testified on direct examination that Berg does not enter into sub-dealer agreements. (Tr. 107:14-21.)

[16] In addition, while approximately 70% of the products listed on Total Liquor's website are Berg Products, at least six of those products had been discontinued, meaning that well under 70% of the products that Total Liquor offers are Berg Products. (*See* Tr. 87:5-22.)

21

In sum, the Court finds that Plaintiff has not demonstrated to the Court through concrete evidence or credible testimony that Berg sales made up even half of its net revenue or that Total Liquor could not pursue other closely-related lines of business; particularly, in the draft beer system business, to account for lost revenue from the termination of the Dealership Agreement. Plaintiff's bare bones allegations of bankruptcy simply have not been borne out. The Court is therefore satisfied that any harm that Plaintiff may incur may be remedied by monetary damages. As such, Plaintiff has not satisfied its high burden to establish irreparable harm, and that failure alone is fatal to Plaintiff's motion for a preliminary injunction. Out of an abundance of caution, however, the Court will analyze the likelihood of success on the merits.

**B.        Likelihood of Success on the Merits**

Plaintiff argues that it has established through testimony and documentary evidence that it is likely to succeed on the merits on its claims for a violation of the NJFPA, breach of contract, and breach of the covenant of good faith and fair dealing. (Pl.'s Post-Hearing Br. 5.)

*1.        The NJFPA*

Total Liquor contends that Berg's termination of the Dealership Agreement violated the NJFPA because it terminated the contract without good cause. (Pl.'s Post-Hearing Br. 5-21.) Berg argues in opposition that Total Liquor is not a franchise covered under the NJFPA, and in any event, the Dealership Agreement was properly terminated. (Def.'s Post-Hearing Reply Br. 7-9.) The Court does not address the question of whether Total Liquor is covered under the NJFPA because even if the NJFPA applies, the Court finds that Plaintiff did not demonstrate a likelihood of success on the merits that the Dealership Agreement was improperly terminated.

The purpose of the NJFPA is to preclude termination "without good cause." N.J. Stat. Ann. § 56:10–5; *Atl. City Coin & Slot Serv. Co. v. IGT*, 14 F. Supp. 2d 644, 658 (D.N.J. 1998). The Act

is intended to prevent "arbitrary or capricious actions by the franchisor who generally has vastly greater economic power than the franchisee." *Id.* "For the purpose of [the NJFPA], good cause for terminating . . . a franchise shall be limited to failure by the franchisee to substantially comply with those requirements imposed upon him by the franchise." N.J. Stat. Ann. § 56:10–5; *Gen. Motors Corp. v. New A.C. Chevrolet, Inc.*, 263 F.3d 296, 320 n.11 (3d Cir. 2001). Defendant argues that Plaintiff failed to substantially comply with the requirements imposed by the franchise in two ways: (1) failing to meet quota; and (2) competing with Berg in contravention of the APA. (Def.'s Post-Hearing Br. 11-13; Def.'s Post-Hearing Reply Br. 7-9.) The Court addresses each argument in turn.

### a.  Quota

Total Liquor argues that Berg has no right to terminate the Dealership Agreement for Total Liquor's failure to meet quota. (Pl.'s Post-Hearing Br. 19-23.) Specifically, it argues that the Dealership Agreement does not explicitly state that failing to meet quota is grounds for termination and that other dealers have also failed to meet quota and were not terminated. (*See id.*) Berg argues in opposition that the quota is enforceable as a term of the contract and that it is irrelevant whether other dealers met their quota or were otherwise terminated. (Def.'s Post-Hearing Br. 12-13.)

Exhibit C of the Dealership Agreement sets forth that Total Liquor's yearly quota is $200,000. (Ex. P-1, Ex. C.) The evidence has demonstrated that Total Liquor has not met its quota in the past ten years. (Ex. D-117; Tr. 116:5-10.) "[N]oncompliance by a franchisee with his reasonable franchise obligations, resulting in an actual or potential adverse effect upon the sales of the franchisor's products, would constitute substantial noncompliance thereof for purposes of termination, impairing as it does the franchisor's fundamental reason for initially entering into the relationship." *Amerada Hess Corp. v. Quinn*, 362 A.2d 1258, 1268–69 (N.J. Super. Ct. Law. Div.

23

1976); *cf. Gen. Motors Corp. v. New A.C. Chevrolet, Inc.*, 263 F.3d 296, 323 n.13 (3d Cir. 2001) (noting that "concerns over the continued financial viability of a franchise are likely to constitute legitimate, reasonable business reasons for the franchise's termination"). As such, the Court finds that Total Liquor's consistent failure to meet quota may constitute substantial noncompliance and thus may provide a valid reason for termination.[17] As such, the Court finds that Total Liquor is not likely to succeed on the merits of its NJFPA claim.

### b.      Improper Competition

Total Liquor argues that the APA does not apply, and even if it did, Plaintiff did not violate the APA by improperly competing with Berg (Pl.'s Post-Hearing Br. 16-19.) Berg argues in opposition that the APA applies because Total Liquor is an affiliate of Dorsey, and Total Liquor violated the APA by working with Smart Bar to pursue a prospective customer for Berg. (Def.'s Post-Hearing Br. 11-12.) The Court addresses each argument in turn.

First, the Court finds that the APA does apply. The noncompete provision applies to the "Seller Parties" and their "respective affiliates." (APA ¶ 6.6(a).) The "Seller Parties" are defined as Berg Company, LLC and "the holders of membership interests of Seller listed as a Member on the signature pages hereto," which includes Dorsey. (ECF No. 9-14 at 1, 20.) Since Dorsey is the owner of Total Liquor, Total Liquor is an affiliate of Dorsey. The APA thus applies to Total Liquor. Plaintiff nonetheless argues that the APA may not be used to terminate the Dealership Agreement. (Pl.'s Post-Hearing Br. 16-17.) But the NJFPA clearly dictates that it is a defense for

---

[17] For purposes of demonstration of likelihood of success on the merits, the Court agrees with Berg that it does not matter whether other dealers were making quota and how they were treated as a result. (*See* Def.'s Post-Hearing Br. 9.) "'Good cause' focuses solely on the objective actions of the franchisee." *Gen. Motors Corp.*, 263 F.3d at 320 n.11. In addition, Barton's testimony was credible as to why he has not pursued termination of other dealers, stating that "I'm in the middle of one lawsuit. I'm not exactly thrilled to start another one." (Tr. 130:6-23.)

any franchisor if a "franchisee has failed to substantially comply with requirements imposed by the franchise and *other agreements ancillary or collateral thereto*." N.J. Stat. Ann. § 56:10-9 (emphasis added). The APA is such an agreement that the parties have demonstrated applies to their relationship. Indeed, Total Liquor concedes that the non-compete provision applies for purposes of the Court determining irreparable harm. It would be disingenuous to also argue that the APA does not apply in the context of analyzing the franchise relationship between Total Liquor and Berg.

The Court next addresses whether Total Liquor breached this non-competition provision by competing with Berg. Dorsey testified that he worked with Smart Bar on a bid to pursue business at Resorts World. (Tr. 92:14-93:5.) He further testified that he believed Smart Bar was an authorized dealer of Berg Products and that as far as he knows, Smart Bar is still a Berg dealer today.[18] (*Id.* at 50:17-51:4.) And even if Smart Bar was not an authorized dealer, when Berg advised Dorsey that Smart Bar was competition, Total Liquor backed out and did not earn any money from the Resorts World deal. (*Id.* at 46:9-47:5.)

On the other hand, Barton credibly testified that he has never seen a Berg dealership agreement for Smart Bar or found any records of such a dealership, but only that Smart Bar purchased equipment from Berg until 2021. (*Id.* at 105:25-106:11.) When asked why doing business with Smart Bar competes with Berg, Barton responded, "[T]hey're our number one competitor, and they do exactly what we do." (*Id.* at 116:23-117:3; *Id.* at 106:12-23 (noting that the three companies "of real importance" in the liquor control systems business are Berg, Smart Bar, and Easybar).)

---

[18] During his testimony, Dorsey could not definitively name the person at Smart Bar who purportedly told him that Smart Bar was a Berg authorized dealer. (Tr. 92:2-13.) The Court, therefore, does not give much weight to this testimony.

Here, the evidence establishes that Total Liquor did work to submit a bid with Smart Bar, (*see id.* at 92:14-93:5), who Barton credibly testified was not an authorized dealer of Berg Products but rather a competitor (*see id.* at 116:23-117:3). While Dorsey testified that he stopped working with Smart Bar as soon as Berg asked him to, the fact that Total Liquor was effectively caught competing does not diminish the fact that it competed with Berg in contravention of the APA. "The NJFPA provides no relief to franchisees whose termination resulted from their own misconduct." *Red Roof Franchising, LLC v. Patel*, 877 F. Supp. 2d 124, 138 (D.N.J. 2012) (quoting *Authorized Foreign Car Specialists of Westfield, Inc. v. Jaguar Cars, Inc.*, No. 98–6008, 1998 WL 34347444, at *2 (3d Cir. Nov. 16, 1998)), *aff'd*, 564 F. App'x 685 (3d Cir. 2014). As such, the Court finds that Total Liquor is not likely to succeed on the merits of its NJFPA claim as it relates to competition. *See Mall Chevrolet, Inc. v. Gen. Motors LLC*, 99 F.4th 622 (3d Cir. 2024) (affirming district court's summary judgment order in favor of franchisor under the NJFPA where the franchisee did not substantially comply with the franchise agreement).

The Court, therefore, finds that Total Liquor is not likely to succeed on the merits of its claim under the NJFPA.

### 2.    *Breach of Contract*

As an initial matter, the Court must decide which law applies to Plaintiff's breach of contract claim: New Jersey or Wisconsin law.[19] "In a diversity case, a district court must apply the choice of law provisions of the forum state," in this case, New Jersey. *Call v. Czaplicki*, No. 09-6561, 2010 WL 3001395, at *4 (D.N.J. July 28, 2010). "New Jersey law states that a contractual choice of law provision will be upheld unless doing so would violate its public policy."

---

[19] The Dealership Agreement states: "The laws of the State of Wisconsin shall govern this Agreement." (Ex. P-1 at 6.)

*Red Roof Franchising, LLC*, 877 F. Supp. 2d at 130. Where the parties are subject to the NJFPA, public policy dictates that "New Jersey would apply its local law to govern the relationship between an out-of-state franchisor and a New Jersey franchisee." *Winer Motors, Inc. v. Jaguar Rover Triumph, Inc.*, 506 A.2d 817, 820 (N.J. Super. Ct. App. Div. 1986). Here, the Court has not held whether the NJFPA applies but finds that there is no true conflict between Wisconsin and New Jersey law concerning breach of contract. *Compare Frederico v. Home Depot*, 507 F.3d 188, 203 (3d Cir. 2007) (Under New Jersey law, "[t]o state a claim for breach of contract, [a plaintiff] must allege[:] (1) a contract between the parties; (2) a breach of that contract; (3) damages flowing therefrom; and (4) that the party stating the claim performed its own contractual obligations.") (citing *Video Pipeline, Inc. v. Buena Vista Home Ent., Inc.*, 210 F. Supp. 2d 552, 561 (D.N.J. 2002)), *with Pagoudis v. Keidl*, 988 N.W.2d 606, 612 (Wis. 2023) (The elements for breach of contract in Wisconsin are "(1) the existence of a contract between the plaintiff and the defendant; (2) breach of that contract; and (3) damages."). Since there is no conflict, the Court applies New Jersey law. *See Call*, 2010 WL 3001395, at *5 (applying New Jersey law where there was no conflict in choice of law analysis).

Since the Court finds that Berg presented strong evidence for its argument that it properly terminated the Dealership Agreement,[20] Total Liquor has failed to demonstrate a breach of the Dealership Agreement. As such, Total Liquor is unlikely to succeed on the merits of its breach of

---

[20] The Court also finds that the record supports a finding that Total Liquor was also properly terminated under the less-stringent termination clause set forth in the Dealership Agreement: "[t]his Agreement . . . will continue in effect until either party terminates, with or without cause, upon thirty (30) days prior written notice." (Ex. P-1 ¶ 15.) Berg gave Total Liquor sixty days' notice before termination on April 20, 2025, which satisfies the 30 days' notice required under the Dealership Agreement. (*See* Ex. P-4 at 1-2.)

contract claim. *See Andrews v. Merchants Mut. Ins. Co.*, 718 F. App'x 135, 139 (3d Cir. 2018) (finding that a breach of contract claim failed "because . . . there was no breach").

### 3.    *Breach of the Covenant of Good Faith and Fair Dealing*

Every contract includes the implied covenant of good faith and fair dealing, which "requires that neither party do anything which will interfere with or destroy each party's reasonable expectations under the contract."[21] *Atl. City Racing Ass'n v. Sonic Fin. Corp.*, 90 F. Supp. 2d 497, 510 (D.N.J. 2000) (citing *Sons of Thunder, Inc. v. Borden, Inc.*, 690 A.2d 575, 587 (N.J. 1997)). Where a party has "an express and absolute right to terminate," it still "must continue in good faith to perform its obligations under an existing contract until the final hour when termination of the contract" takes effect. *Id.* at 511-12. Here, as the Court has already found, Berg provided persuasive evidence to support its argument that it properly terminated the Dealership Agreement with Total Liquor, by providing 60 days' notice of termination and grounds for terminating the agreement with good cause. As such, Berg could not have interfered with Total Liquor's reasonable expectations of the Dealership Agreement. *See id.* (granting motion for summary judgment where defendant properly terminated the contract and performed through the effective termination, and therefore did not breach the implied covenant of good faith and fair dealing).

The Court, therefore, finds that Total Liquor is not likely to succeed on the merits of its claims.[22] Since Total Liquor has not satisfied irreparable harm or likelihood of success on the

---

[21] The Court adopts its choice of law analysis concerning breach of contract for the breach for the implied covenant of good faith and fair dealing claim. Since Wisconsin and New Jersey law are largely similar as to the implied covenant of good faith and fair dealing, there is no true conflict and the Court applies New Jersey law. *See Kreckel v. Walbridge Aldinger Co.*, 721 N.W.2d 508, 514 (Wis. Ct. App. 2006) (noting that "[t]he duty to provide prompt or reasonable notice is rooted in the duty of good faith and fair dealing, which in Wisconsin is part of every contract").

[22] To be clear, the Court is not granting summary judgment with respect to any claim. Rather, the Court will consider summary judgment motions after discovery when a complete record has been developed.

merits, otherwise known as the "gateway factors" of a preliminary injunction, the Court need not consider the other two factors. *See Reilly*, 858 F.3d at 179; *Nutrasweet*, 176 F.3d at 153 (stating that a "plaintiff's failure to establish any element . . . renders a preliminary injunction inappropriate").

## IV.  CONCLUSION

For the reasons set forth above, **Plaintiff's** Motion for a Preliminary Injunction, reconsidered on remand with the benefit of an evidentiary hearing and additional briefing, is denied. The Court will issue an Order consistent with this Memorandum Opinion.

MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE